Filed 1/5/15

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E058915 |
| v. | (Super.Ct.No. FBA1200751) |
| MADOU TOURE, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County. John M. Tomberlin, Judge. Affirmed with directions.

Mark D. Johnson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles Ragland, Scott C. Taylor, and Meredith S. White, Deputy Attorneys General, for Plaintiff and Respondent.

Madou Toure, the defendant, drove his semi-truck westbound on State Route 58, traveling for some distance in the eastbound lane of on-coming traffic before colliding

1

head-on with an automobile carrying two occupants. Throughout the investigation of the incident by the California Highway Patrol (CHP), defendant was violent and combative, continuing his resistance even at the CHP station. Defendant refused to consent to blood alcohol testing after being admonished of the implied consent provisions of the Vehicle Code, so a nonconsensual warrantless blood draw was performed while defendant was restrained. After a jury trial, defendant was convicted of felony driving under the influence of alcohol causing injury (Veh. Code, § 23153, subds. (a), (b)),[1] driving on a suspended license (§ 14601.2, subd. (a)), and resisting an executive officer (Pen. Code, § 69). He was sentenced to four years in state prison and appealed.

On appeal, defendant argues (1) his four year state prison sentence was unauthorized in the absence of pleading or proof of prior drunk driving convictions; (2) his felony drunk driving convictions must be reversed because the blood alcohol evidence was obtained without a warrant, exigent circumstances, or his consent, in violation of his Fourth Amendment rights; and (3) his convictions under both subdivisions (a) and (b) of section 23153 were improper. The People concede that the court imposed the incorrect sentence for driving under the influence with injury. We modify the sentence but otherwise affirm.

---

[1] All further statutory references are to the Vehicle Code unless otherwise indicated.

# BACKGROUND

On December 23, 2012, at approximately 8:30 or 9:00 p.m., Alece Collins was driving in her automobile behind a Penske truck and a tractor-trailer semi-truck westbound on State Route 58 near Highway 395, in San Bernardino County. The tractor trailer swerved several times over the lane division line, into the eastbound lane of travel. Then it continued for approximately two miles in the eastbound lane of oncoming traffic, eventually striking a gray or silver passenger car.[2] Other cars in the eastbound lane swerved and went off the road to avoid the tractor-trailer, which continued westbound in the eastbound lane.

The semi-truck eventually stopped a few thousand feet west of the site of the collision, on the right side of the road, which was on the north side of the westbound lane. The Penske truck pulled in front of the semi-truck and stopped, while Ms. Collins pulled in behind the semi-truck. The driver of the Penske truck called 9-1-1. The defendant exited the semi-truck, mumbling. Ms. Collins and two of the occupants of her vehicle exited her vehicle. Ms. Collins took a BB gun with her, and one of her companions checked the interior of the cab of the semi-truck for other occupants, but found none. One of Ms. Collins' companions took the keys out of the ignition of the semi-truck so defendant could not drive off again, because defendant had said something like, "I'm out of here," and had gotten back into the cab of the truck. The interior of the truck smelled of alcohol so Ms. Collins assumed defendant was intoxicated.

---

[2] To avoid confusion, we will refer to this vehicle as the gray car.

3

After taking the keys to the semi-truck, Ms. Collins and her companions drove to the location of the gray car that had been struck by the semi-truck, to check on the welfare of its occupants. In the meantime, a CHP officer arrived at the location of the gray car in response to the dispatches of a wrong-way tractor trailer, and the later report of the collision. The officers stopped first at the location of the gray car, which had been struck by defendant's vehicle, where the vehicle's two occupants complained of neck and back pain. The gray car had damage to the driver's door and part of the driver's side tire was smashed in. At some point, the person who had defendant's truck keys turned them over to one of the officers.

Because the ambulance was already en route, the CHP officers then drove a few thousand feet west, to the location where the semi-truck was stopped behind the Penske moving truck. Defendant was the sole occupant of the semi-truck, and was seated in the driver's seat with his hands on the steering wheel when the officers approached. The keys to the semi-truck were not in the ignition and were not found in defendant's possession. There was damage to the left front wheel of the semi-truck and the tire was completely gone. Additionally, there was damage to the driver's side step. The asphalt bore marks where the tireless rim had driven and scraped, and the body of the truck had paint transfers that matched the car with which the truck had collided.

CHP Officer Chester opened the passenger side door and asked defendant to exit the vehicle, more than once. As soon the door of the truck cab opened, the officer could smell alcohol. Defendant yelled obscenities and the officer had to repeat his request two

4

or three times before defendant started to walk between the dashboard and the passenger's seat towards the passenger door. Officer Chester grabbed defendant's arm to assist him out of the truck, fearing that defendant would fall out of the truck if impaired by drinking.

Defendant was angry and clenched his fists. Officer Chester asked defendant to turn around so he could frisk defendant for weapons, but as defendant turned around, he spun to the left with his left elbow. CHP Officer Williams, Officer Chester's partner, blocked the blow and applied a bent wrist control hold on defendant. Throughout the process, defendant continued yelling obscenities, and struggled to free his arms from Officer Williams' control.

After being handcuffed, the defendant still fought and screamed, yelling obscenities and kicking Officer Williams. At around this time, CHP Officers Camara and Bostrum arrived. Because defendant was now spitting at the officers, Officer Camara put a spit sock over his head. As Officer Camara put the spit sock on defendant, the officer noticed defendant's eyes were red and watery, his speech was slurred, and the officer could smell alcohol on defendant's breath. However, field sobriety tests could not be administered due to the state of defendant's agitation. Defendant continued to struggle, thrash about, and kick the officers, so leg restraints were applied upon the arrival of two deputies from the San Bernardino County Sheriff's Department.

After restraining defendant, Officers Williams and Bostrum searched the cab of the semi-truck, looking for vehicle registration, insurance information, and log books.

5

The officers were also looking for open containers of alcohol to make sure defendant did not consume alcohol after the collision. The log books showed no entries for a co-driver on the date and at the time of the accident, although there are places to enter that information. After the officers completed the search of the truck, they transported defendant to the CHP station in Barstow.

At the Barstow station, Officer Camara admonished the defendant of the implied consent to blood-alcohol testing, but defendant refused, using more profanity. Defendant did not consent, but he was still agitated, and he could not be released from restraints until after a blood draw had been performed (he had been "hogtied" for approximately one to two hours already), so the officers wanted to limit the time defendant was in that position. Because blood alcohol content degrades over time, two hours had already passed, and because he was unsure of the availability of a magistrate who could issue a warrant, Officer Camara consulted with his sergeant, who approved a forced draw. The results of the tests on defendant's blood showed a 0.15 blood alcohol level.

Defendant was charged with driving under the influence of alcohol causing injury (§ 23153, subd. (a)), with a special allegation that he refused to submit to chemical testing (§ 23612; count 1); driving with 0.08 or higher blood alcohol (§ 23153, subd. (b), count 2); driving on a suspended license[3] (§ 14601.2, subd. (a), count 3); and resisting an

_____

[3] Defendant's driving privileges were suspended in August 2012 (the exact date is unclear as there are references to August 28 and August 31, 2012) as a consequence of a prior conviction for driving with an excessive blood alcohol level, although the information did not allege the fact of the prior conviction.

executive officer (Pen. Code, § 69, count 4).  Defendant was tried by a jury that convicted him of all counts.

On June 4, 2013, defendant was sentenced to 4 years, 8 months in state prison. Defendant timely appealed.

**DISCUSSION**

1.    *Defendant's Sentence Must Be Modified*.

Defendant argues the court imposed an unauthorized four-year sentence term for count 1, section 23153, subdivision (a), where the maximum term for such a violation, accompanied by an allegation of refusal to submit to a chemical test for blood-alcohol, with a single prior conviction is three years.  The People agree, because the defendant's prior convictions for driving under the influence were neither pled nor proven.[4]  We agree.

The allegation that defendant refused to submit to a chemical test for blood alcohol does not carry any additional custodial penalty, although it may result in mandatory imprisonment.  (§ 23612, subd. (a)(1)(D).)  And because the People did not plead or prove any prior convictions for driving under the influence, defendant could only be punished for a first offense, pursuant to section 23554.

The punishment for a first offense of driving under the influence causing bodily injury is a wobbler sentence: incarceration in state prison for 16 months, 2 years, or 3

---

[4] The Appellant's opening brief seeks modification of the sentence for count 1, but the People argue that the sentence imposed on both counts was affected.

7

years, or in county jail for not more than 1 year, and not less than 90 days. (§ 23554.) The court imposed a prison term of 4 years, an unauthorized term, for both counts 1 and 2. Defendant's sentence must be modified downward. We remand the matter to the trial court for resentencing to give the trial court an opportunity to give reasons for imposing the upper term, separate and apart from the facts underlying any other term imposed. (Cal. Rules of Ct., rule 4.425(b).)

2. *The Trial Court Properly Denied Defendant's Oral Motion, Made Mid-trial, to Suppress the Results of Chemical Testing of His Blood, Which Was Drawn Without a Warrant or Defendant's Consent.*

Mid-trial, defendant argued that the results of the blood alcohol testing of his blood, taken forcefully after he refused to consent, should be suppressed, pursuant to the recent decision of *Missouri v. McNeely* (2013) ___U.S.___ [133 S.Ct. 1552, 185 L.Ed.2d 696] (*McNeely*). Although not brought pre-trial, the court permitted defendant to make an oral motion to suppress the blood alcohol test results of his blood because his blood was drawn without a warrant and without his consent.

After conducting an evidentiary hearing, the court concluded there were exigent circumstances to justify the forced blood draw because defendant's uncooperative attitude during the detention prevented the officers from conducting field sobriety tests and learning when defendant stopped drinking, and getting a warrant would consume time during which the blood alcohol level would dissipate. On appeal, defendant argues

that the prosecution failed to establish exigent circumstances to justify the warrantless search. We disagree.

In reviewing the denial of a motion to suppress evidence, "[w]e defer to the trial court's factual findings, express or implied, where supported by substantial evidence. In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment. [Citations.]" (*People v. Glaser* (1995) 11 Cal.4th 354, 362.)

We begin with the general rule that warrantless searches are presumptively unreasonable unless conducted pursuant to one of the narrowly drawn exceptions to the warrant requirement. (*Arizona v. Gant* (2009) 556 U.S. 332, 338 [129 S.Ct. 1710, 173 L.Ed.2d 485]; see also, *United States v. Robinson* (1973) 414 U.S. 218, 224 [94 S.Ct. 467, 38 L.Ed.2d 427].) One well-recognized exception applies when the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable under the Fourth Amendment. (*Kentucky v. King* (2011) 563 U.S.___, ___ [131 S.Ct 1849, 1856, 179 L.Ed.2d 865].) In some circumstances law enforcement officers may conduct a search without a warrant to prevent the imminent destruction of evidence (See *Cupp v. Murphy* (1973) 412 U.S. 291, 296 [93 S.Ct. 2000, 36 L.Ed.2d 900; *Ker v. California* (1963) 374 U.S. 23, 40-41 [83 S.Ct. 1623, 10 L.Ed.2d 726].) However, while the natural dissipation of alcohol in the blood may support a finding of exigency in a specific case, as it did in *Schmerber v. California* (1966) 384

9

U.S. 757 [86 S.Ct. 1826, 16 L.Ed.2d 908] (*Schmerber*), it does not do so categorically. (*McNeely, supra,* 133 S.Ct. at p. 1563.)

To determine whether a law enforcement officer faced an emergency that justified acting without a warrant, the court looks to the totality of the circumstances. (*McNeely, supra,* ___U.S. ___ [133 S.Ct. at p. 1559]; *Ohio v. Robinette* (1996) 519 U.S. 33, 39 [136 L. Ed. 2d 347, 117 S. Ct. 417].) In *Schmerber,* the court found circumstances justified the nonconsensual warrantless draw because the defendant had been injured in an automobile accident, and was taken to a hospital where he was arrested for driving under the influence while receiving treatment. (*Schmerber, supra,* 384 U.S. at pp. 758-759.) The United States Supreme Court upheld the nonconsensual warrantless blood draw because time had to be taken to bring the accused to a hospital and to investigate the scene of the accident, leaving no time to seek out a magistrate to secure a warrant. (*Id.*, at pp. 770-771.)

The high court recognized that the "percentage of alcohol in the blood begins to diminish shortly after drinking stops, as the body functions to eliminate it from the system." (*Schmerber, supra*, 384 U.S. at p. 770.) Because the "'delay necessary to procure a warrant . . . may result in the destruction of valuable evidence,'" "'blood and breath samples taken to measure whether these substances were in the bloodstream when a triggering event occurred must be obtained as soon as possible.'" (*People v. Thompson* (2006) 38 Cal.4th 811, 825, quoting from *Skinner v. Railway Labor Executives' Assn.* (1989) 489 U.S. 602, 623 [103 L. Ed. 2d 639, 109 S. Ct. 1402].)

10

However, in *McNeely,* the court declined to adopt a *per se* exigency rule applicable in all driving under the influence cases based on dissipation of alcohol in the blood over time, preferring to adopt a case-by-case approach. (*McNeely, supra,* 133 S.Ct. at p. 1564.) The court emphasized there that the case was a routine driving while intoxicated case that did not involve special facts, such as the need for police to attend a car accident. (*Id.,* at p. 1568.) "The relevant factors in determining whether a warrantless search is reasonable, including the practical problems of obtaining a warrant within a timeframe that still preserves the opportunity to obtain reliable evidence, will no doubt vary depending upon the circumstances in the case." (*McNeely, supra*, 133 S.Ct. at p. 1568.) Because of the circumstances of the *Schmerber* case, the court did not disapprove its holding.

In the present case, applying the case-by-case approach to determine the totality of the circumstances, we conclude that exigent circumstances justified the nonconsensual warrantless blood draw: there was a traffic accident in which at least one person sustained injuries approximately 2000 feet from where the defendant finally came to a stop after blowing the tire of his semi-truck. The defendant was combative, requiring the administration of physical restraints, which delayed their investigation of the accident and prevented the officers from conducting field sobriety tests, unlike the defendant in *McNeely*. Defendant refused to provide officers with information, yelling profanities at them, thereby preventing the officers from determining when he had stopped drinking, also unlike the defendant in *McNeely*.

11

The time it took to subdue defendant and transport him to the CHP station, after conducting a brief investigation of the accident scene consumed approximately two hours:  The original call came at 9:07 p.m., and they were back at the station with defendant in custody at 11:03 p.m.  The officers wanted to get the defendant to the station as soon as possible because they were aware that the restraints were uncomfortable, but could not be removed until he was booked in the jail.

In this case, it would have been impossible to "calculate backward" to determine the defendant's blood alcohol level at the time of the accident.  The officers were prevented from discovering when the defendant ingested his last drink, the starting point for such a determination, due to the defendant's combativeness and refusal to cooperate.  Further, the time it took to conduct their investigation of the accident scene and to subdue the defendant threatened the destruction of the evidence.  (*McNeely, supra,* 133 S.Ct. at pp. 1560-1561, citing *Schmerber,* 384 U.S. at pp. 770-771.)

The situation facing the officers was not one in which the sole consideration was the natural dissipation of alcohol in the blood as the sole basis for finding an exigency.  Instead, the delays involved in obtaining a warrant (we can take judicial notice that the closing of branch courts in San Bernardino County impacts the time required to obtain a warrant),[5] the unavailability of information relating to when defendant stopped drinking,

_____

[5]  At oral argument in this court, as well as in the trial court, defendant argued that the People failed to show exigent circumstances because a warrant could have been obtained telephonically, or via email, or fax.  However, no evidence was adduced at the hearing as to the availability of electronic warrants at the time of the incident.

12

in addition to the natural dissipation of alcohol in the blood, coupled with his violent resistance, established exigent circumstances.

The nonconsensual warrantless blood draw was reasonable under the totality of the circumstances.

3.      *Defendant's Convictions Under Subdivisions (a) and (b) of Section 23153 Were Proper.*

In a supplemental brief, defendant argues that the trial court should have stricken one of the convictions under section 23153 because they are alternate statements of the same offense.  We disagree.

Section 23153 is the felony counterpart of section 23152, except that subdivisions (a) and (b) of section 23153 each contain the element of bodily injury or death.  (*People v. Subramani* (1985) 173 Cal.App.3d 1106, 1111 (*Subramani*).)  When the Legislature enacted section 23152, adding the provision making it criminal to drive with a 0.10 percent (now 0.08 percent)[6] or more blood alcohol level, the California Supreme Court held that subdivision (b) of section 23152 was not an alternate definition of driving under the influence, and it was not a lesser included offense of that proscribed in subdivision (a).  (*Burg v. Municipal Court* (1983) 35 Cal.3d 257, 265.)  Under section 23152, subdivision (b), it is not necessary to prove that the defendant was in fact under the influence; the People must prove beyond a reasonable doubt that at the time defendant

---

[6] The Legislature lowered the prohibited blood-alcohol concentration from 0.10 percent to 0.08 percent in 1989.  (See *People v. Bransford* (1994) 8 Cal.4th 885, 888.)

13

was driving he had the requisite blood alcohol level.  (*Burg v. Municipal Court, supra,* 35 Cal.3d at p. 265.)

Similarly, the offense defined by section 23153, subdivision (b) is separate and distinct from that defined in section 23153, subdivision (a), and neither is a lesser included offense of the other.  (*Subramani, supra,* 173 Cal.App.3d at p. 1111.)  Because the charges involve different offenses entailing different elements of proof, a defendant may be properly convicted of both.  (*People v. Rocha* (1978) 80 Cal.App.3d 972, 975.) Indeed, a conviction for driving under the influence under subdivision (a) of section 23153 need not pertain to alcohol; the subdivision also proscribes driving under the influence of drugs.  A defendant can be charged under subdivision (a) of section 23153 for driving under the influence of methamphetamine, and at the same time have a blood alcohol level in excess of 0.08, so the two offenses do not define different ways of committing the same offense.

Because neither subdivision of section 23153 describes a lesser included crime of the other, it has long been held that dual convictions are both possible and proper. (*People v. Duarte* (1984) 161 Cal.App.3d 438, 446 (*Duarte*).)  Thus, it is well settled that a defendant may be convicted of both driving under the influence of alcohol and driving with a blood alcohol level of 0.08 percent or more.  (*Subramani, supra,* 173 Cal.App.3d at p. 1111.)  Defendant's reliance on authorities relating to multiple counts of forgery pursuant to Penal Code section 470, where the different counts related to different ways

14

of committing the same offense, are inapposite. (Ref., *People v. Ryan* (2006) 138 Cal.App.4th 360, 364.)[7]

Although he may be convicted on both, a defendant may not be sentenced under both subdivisions where both charges relate to the same act of driving, so the term on one of the counts was required to be stayed. (Pen. Code, § 654; *Duarte, supra,* 161 Cal.App.4th at pp. 446-447; see also, *Subramani, supra,* 173 Cal.App.3d at p. 1111.) In this case, the court properly imposed and stayed the punishment on count 2 in the oral pronouncement of judgment. However, the minutes of the sentence are not in accord with the oral pronouncement, or with the original abstract, or the amended abstract. The minutes state that defendant was sentenced to the upper term of 4 years for count 2, with an indication that the term would run both consecutive to count 1, and that it would be stayed. Both of the abstracts of judgment indicate consecutive terms for counts 1 and 2.

A sentence cannot be imposed so as to simultaneously run consecutively to another count and be stayed pursuant to Penal Code section 654; these are mutually exclusive options. While it is proper for a court to pronounce judgment in terms of "imposing a term" and "staying punishment," it is incorrect to indicate in the minutes or abstract that the sentence thus imposed runs "consecutive," as well. Because of the importance of the abstract of judgment as the commitment order (Pen. Code, § 1213; *People v. Mitchell* (2001) 26 Cal.4th 181, 185), we offer guidance. On the abstract of

---

[7] Defendant also relied on *People v. Falls* (2014), formerly at 223 Cal.App.4th 481, but that case was ordered not published by the California Supreme Court on April 30, 2014.

judgment, when a term is stayed, on the line indicating the sentence for count 2, a single "X" should be inserted in the box indicating the punishment is stayed pursuant to Penal Code section 654.

Because the sentence is being remanded for correction of the upper term for count 1, the superior court is directed to amend the sentencing minutes to delete reference to a consecutive term for count 2. We further direct the superior court to amend the abstract of judgment so as to delete the "X" from the column indicating "consecutive full term," and to leave the "X" in the column indicating a Penal Code section 654 stay.

## DISPOSITION

The matter is remanded for resentencing on counts 1 and 2. In addition, the superior court is directed to amend the sentencing minutes and the abstract of judgment to reflect that the term for count 2 was stayed pursuant to Penal Code section 654 only. In all other respects, the judgment is affirmed.

CERTIFIED FOR PUBLICATION

RAMIREZ

P. J.

We concur:

McKINSTER

J.

CODRINGTON

J.

16